Please be seated. Thank you. Please call the next case. Next this morning, case number 5-12-0013, Faye Blayton v. Workers' Compensation Comm'n. Counsel? Counsel, member of the court, it's my pleasure to be here today. My name is Larry Calvo, and I'm the attorney for the petitioner, Faye Blayton, whose occupation is a nurse. She testified at arbitration extensively about her repetitive jobs at work. The defendants had Ms. Blakely seen for an IME by a Dr. Brown. Her supervisor sent Dr. Brown a physical demand sheet, which indicated the number of hours per day she did repetitive tasks. Based on that, Dr. Brown issued a report that he felt that this could be causally related. Her work duties could be causally related, even though they weren't enumerated, just the times that she did repetitive acts was enumerated. Then after her supervisor, Mr. Urban, discussed the matter with an HR person for the company, she instructed Mr. Urban to do another physical demand sheet and send a new sheet to Dr. Brown. Well, the new sheet showed that the petitioner didn't do anything repetitively for any hours a day. Based on that, Dr. Brown issued another report saying that it wasn't causally related. Then after he examined the petitioner, he again stated it wasn't related and based his conclusion on her lack of repetitive duties. When asked under cross-examination at the time of his evidence deposition, Dr. Brown did not think that the nurse, Faye Blakely, had any predisposition to develop carpal tunnel. She wasn't a diabetic. She had no other medical conditions that could be relative to that condition. The only thing he could contribute it to was her sex and her age. And that's what he said at his deposition. The industrial commission relied on the cross-examination done by the respondent's attorney who put a hypothetical nurse in front of Dr. Heffner indicating that she did not as part of her duties, often open and close oxygen tanks. And that's what the commission used to say that Dr. Heffner in fact did not show that there was a causal connection because of the cross-examination. When in fact, Dr. Heffner testified that he was unsure what a nurse of Ms. Blakely's occupation did, but based upon his prior history of her, he felt that there was a causal connection. Counsel, so you have a classic case. You've got conflicting medical evidence. Is that fair to say? Well, the question, Your Honor, is not whether it's conflicting. It's whether it's sufficient evidence that the commission could rely upon under our manifest weight provision that it has to be credible. Who determines credibility? In this situation, this court does. We substitute our judgment for that of the commission? No, you don't. But you decide whether this is actual evidence, whether the commission's decision is sufficiently supported by evidence and not upon speculation. What I'm saying is Dr. Brown's testimony constitutes speculation, especially the way that they went about to get it. They forward two inconsistent reports. The first report, I'm saying, was the accurate report. And their doctor responded the way he should have responded, that there was causal connection or might or could have been. After the supervisor went to his HR person, who in fact was his supervisor, in handling the work-hop case for the respondent, he changed the sheet. Sent a new sheet. A new report was issued showing no causal connection. If that doesn't constitute speculation for this court, and evidence that shouldn't be used under manifest weight, I don't know what does. Was that argument made in the lower courts? Yes, the argument was made. Well, the commission had those two varying opinions, which I have to say this idea will give you one job description. We don't like your opinion. We'll give you a new job description. The suspect, however, the commission had all the testimony about what the claimant actually did. They had all that evidence before him. So why wouldn't it be just an issue of manifest weight? It is an issue of manifest weight. In other words, couldn't they have determined that there was some kind of repetitive activity? I'd like to respond in just a second. Here's what the commission has forgotten. Here's what the arbitrators have forgotten. This is what the court needs to remember. It is a well-settled principle that the Act is a remedial statute that should be liberally construed to effectuate its main purposes, which is to provide financial protection for injured workers, regardless of a showing of negligence or contributory negligence, while precluding employees from common law tort remedies. And that's interstate scaffolding, pathfinder, Peoria County development, all those cases cite that premise. The commission has forgotten about that. We're no longer involved in a situation where arbitrators are civil servants. They're appointed by the governor. We have a problem in southern Illinois. Now the petitioners, the workers, are the ones that are facing the wrath, the wrath of politics, not the wrath of the court. But we could use manifest weight to right the ship and say the employers just can't send them to IME doctors who changed their opinions because they changed the facts. What's right about that? What's justice got to say about that? With Dr. Brown, initially, his causation opinion was consistent with what the employee was wanting. Right. Based upon the first sheet, that physical demand sheet. So what was it that caused Michael Urban to redo that? He was told to redo it by the HR director. Okay. Told, not asked, told to send a new sheet out. I can't say that she told him to put zeros in there. But he was told, because it was a workers' comp case, to send a new sheet out, which is what he did. And he said something along the lines that he wasn't familiar with. Right. He wasn't familiar with what repetitive trauma is. He's still not familiar with what repetitive trauma is. Is this typical that someone would be tasked with that responsibility of defining what is repetitive injury? No, what's typical is you send a person to an IME doctor, they take a history of the patient, and issue a report after that. They don't do it ahead of time. And so that second physical demand sheet was inconsistent with the employee's history? Well, it inconsistent with the procedures that are normal for IMEs. Just like you said, you don't need to send physical demand sheets. The doctor didn't request the employer to tell him what the job was. A nurse is not a stupid person. She can tell him everything she does and when she does it and how she does it. You don't need a physical demand sheet. But they simply used a physical demand sheet as a clue to tell him what to do. It was simply a clue. But it wasn't ruled to be an inadmissible basis for Dr. Brown's causation opinion? No. I assert that we're facing a situation. I've been doing this for 48 years now. We're facing a political situation where there's fear downstate to do anything that's right by the working person. IMEs are being used now to not only put people out of work, but deny them medical benefits and TCB. There's something really wrong here. And the governor is behind it because the governor sits there, appoints these people, and then he has to reappoint them. So if they don't respond the way they're supposed to politically, they don't get reappointed. It's as simple as that. However, in this case, it was arbitrator T who was terminated. And that was then affirmed in the document. So everything you're saying about political things wouldn't apply to this case. Oh, of course it does. She was fearful at the time before she was terminated that she'd be terminated. Why doesn't it apply? It applies to every single one of these people. It applies to people on the commission now. We have people serving at arbitrators that have no experience in workers' comp. We have people sitting on the commission that have no experience in workers' comp. They're there strictly for political reasons. They're there to get us in line downstate so that the prison issue never happens again. Well, I've had enough. I wasn't involved in that. I've been honest 48 years of my life. I don't deserve this. My people that I represent don't deserve this. And I apologize. I disagree with you, Mr. Calvo, but what are we supposed to do? Well, follow the law and manifest weight, Judge. I mean, it's right there. If this isn't one, I don't know what is. And I've got another one in the afternoon. I'll see you there. Thank you. Thank you, Mr. Calvo. Ms. Litzenberg? Yes, Your Honor. You may respond. May it please the Court, Counsel, my name is Deanna Litzenberg, and I represent the Respondent Memorial Hospital in this case. What is troubling here in terms of this physical demand sheet? What's the story on that? Can I explain, Your Honor? I wish you would. I believe Counsel misinterpreted or misrepresented the situation. As under Section 12, employers can. They scheduled Ms. Blakey for an independent medical examination. And in preparation for that IME, they sent her the medical records and they sent her a physical demand sheet. She attended the IME with the sheet there. The first report was written based upon the physical examination and upon Ms. Blakey's description of her respiratory therapist duties. I think Counsel's confused. She's a respiratory therapist. She's not a nurse. She performs primarily, as part of her job, nebulizer treatments. And Dr. Brown indicated in his first report, based upon the IME, that she represented typical duties of a respiratory therapist. And he did not believe that respiratory therapist duties were typically of a repetitive nature. She performs three to four nebulizer treatments an hour and testified that during those nebulizer treatments, eight to ten minutes of the time, she's standing back doing nothing. She's watching while the patient is breathing in the treatment through the mask. And there's no hand duty for a good eight to ten minutes of that treatment. I'm getting back to Dr. Brown. Dr. Brown then said, based upon her description, I don't believe her job is repetitive such that it would cause carpal tunnel. But I have received this physical demand sheet. I don't believe this physical demand sheet is consistent with her job duties. But if it was correct, I would find it to be causally related. Did he say all that in the first report? He did, very clearly. And that was entered into evidence with his deposition. Mr. Urban testified at trial. He had never filled out one of these physical demand sheets before. His employer sent it to him. He thought a physical therapist was going to come down and help him with it, but he filled it out. And on that sheet he said that she performed repetitive activities for five to six hours a day. He didn't know what repetitive meant, and he felt uncomfortable with his answers. Contrary to what counsel said, HR didn't tell him to fill out a new form. He didn't even know what Dr. Brown had said. He's never been shared a copy of a report. He went back to HR and said, hey, I don't feel comfortable with how I filled that out. Well, if you feel uncomfortable, why don't you fill out another one? And he did. He went to them. Is there any contrary evidence? There's no contrary evidence. They sent the new sheet to Dr. Brown, and Dr. Brown, based upon the new sheet, said, I agree. This is consistent with what she told me. There's no causal relation to her activities at work. In the first sheet that Mr. Urban filled out, he said that she performed five to six hours a day of repetitive duties. The math doesn't add up. If she's doing three to four treatments an hour, and she's standing there for eight to ten minutes of that treatment doing nothing, that's 32 to 40 minutes per hour of just standing there watching the patient. Over the course of an eight-hour shift, that's almost five hours of rest. It's not consistent with saying that she's heavily gripping an activity for five to six hours. So Dr. Brown indicated that it was not causally related. Her own treating physician, Dr. Hefner, initially said that her activities as a respiratory therapist, doing 30 to 40 breathing treatments a day, and turning on and off oxygen tanks, could contribute to cross-carpal tunnel. On cross-exam, I asked him to assume that her job duties don't include turning on and off oxygen tanks. And he said, well, that's the activity that would have some effort at the wrist. If that's not part of her job duties on a significant basis, then I would have difficulty relating her appointment to carpal tunnel. It was undisputed at trial. Petitioner agreed. She doesn't change oxygen tanks. That respondent employs oxygen tanks, which are in charge of the oxygen tanks. And accordingly, Dr. Hefner had an incorrect description of what her job duties were. Didn't he also admit in his deposition that he was only familiar with the respiratory therapist job duties to some extent? To some extent, yeah. He admitted that himself, didn't he? Yeah. He admitted that, that he wasn't familiar with what respiratory therapists do. So the commission is the fact finder. They have the ability to weigh the credibility and the weight of the evidence, and they found in favor of the respondent that their petitioner did not meet her burden of proof in this case. And for that reason, we would ask the court to adjourn the decision. Thank you. Thank you, counsel. Thank you. Mr. Cavill, you may reply. Thank you, counsel, for your arguments. This matter will be taken under advisement. This position shall issue.